**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
THE AMERICAN FEDERATION OF      )
TEACHERS, AFL-CIO, *et al.,*    )
                                )
            Plaintiffs,         )
                                )
       v.                       )   Civ. Action No. 03-79 (EGS)
                                )
BARBARA BULLOCK, *et al.,*      )
                                )
            Defendants.         )
                                )
_____)

### MEMORANDUM OPINION

This case arises from an illegal scheme to embezzle funds
from the Washington Teachers' Union, Local No. 6, AFL-CIO
("WTU").  Defendant Independence Federal Savings Bank ("IFSB" or
"Bank") has moved for summary judgment.  Upon consideration of
the motion, responses and replies thereto, oral argument during
the motions hearing, applicable law, and the entire record, the
Court finds that this case is fraught with genuine issues of
material facts in dispute.  Accordingly, defendant's motion for
summary judgment is **DENIED.**

I.    **BACKGROUND**[1]

    A.    **The Parties**

       Plaintiff, The American Federation of Teachers, AFL-CIO ("AFT"), is a national labor union for teachers, which is an affiliated international union of the AFL-CIO.  AFT represents local labor unions primarily made up of public and private school teachers, paraprofessionals and higher education faculty.  AFT is a national labor organization with which local and state labor organizations are affiliated.  To affiliate with the AFT, local unions pay dues.  Plaintiff Washington Teachers' Union, Local No. 6, AFL-CIO ("WTU") is the local affiliate of the AFT for teachers in Washington, D.C.

       There are a number of individual defendants in this action (collectively, "Individual Defendants").  Defendant Barbara A. Bullock ("Bullock") served as the President of WTU from mid-1994 to September 2002.  As President, Bullock was an officer, agent and representative of the WTU, had check-signing authority for the WTU's bank accounts, and had overall responsibility for administering the affairs of the WTU.  Defendant James O. Baxter,

---

[1]Unless otherwise indicated, all facts and alleged factual disputes noted in this section draw from the defendant's Statement of Undisputed Facts ("Def.'s Facts"), plaintiffs' Statement of Disputed Material Facts ("Pls.' Facts"), defendant's Response to Plaintiffs' Disputed Facts ("Def.'s Reply Facts"), and defendant's Response to Plaintiffs' Statement of Facts Giving Rise to Genuine Issues of Material Fact ("Def.'s Resp. To Pls.' Facts").

II ("Baxter") served as the Treasurer of WTU during Bullock's tenure as President.  Baxter was an agent, employee and representative of the WTU and had check-signing authority for WTU's bank accounts and financial responsibility for WTU's affairs.  Defendant Gwendolyn M. Hemphill ("Hemphill") was an employee of the WTU and served as Bullock's Special Assistant during Bullock's tenure as President.  Hemphill shared responsibility for WTU's day-to-day financial affairs with Baxter.  Defendant Leroy Holmes was a WTU employee and worked as Bullock's chauffeur for some portion of the relevant time period.

     Defendant Cheryl Martin is Hemphill's daughter.  Defendant Michael Martin ("Martin") is Hemphill's son-in-law and husband of Defendant Cheryl Martin.  Defendant Errol Alderman ("Alderman") is an acquaintance of Michael Martin.  Defendant Gwendolyn B. Clark ("Clark") is Bullock's sister.

     Defendant IFSB is a federally chartered commercial bank that was founded in 1968.  IFSB has six branches in Washington, D.C. and Maryland.  Between 1994 and 2002, WTU maintained several bank accounts at IFSB, including a "Premier Checking Account," with which the WTU conducted its day-to-day business, including payroll for WTU employees.

### B.   The Embezzlement Scheme

     The Individual Defendants engaged in a scheme to embezzle, convert, and misuse the WTU's funds beginning in 1995 and ending

in 2002. Def.'s Facts ¶ 38. There is no indication that the WTU Executive Board or the WTU's members authorized the Individual Defendants' appropriation of WTU funds for personal use. *Id.* ¶ 39. Between 1995 and 2002, Bullock, Baxter, and Hemphill wrote checks on the WTU's IFSB bank account for unauthorized, non-union business. *Id.* ¶ 40. Hundreds of these checks were made payable to Holmes, who then cashed the checks at IFSB, retained some of the cash for himself and returned the remainder of the cash to the other Individual Defendants. Def.'s Resp. To Pls.' Facts ¶¶ 15 - 19. Some of these checks cashed by Holmes exceeded $10,000. *Id.* ¶ 20. According to plaintiffs, between 1997 and 2002, the checks cashed by Holmes on the WTU's IFSB account totaled between $1.45 and $1.7 million. While not conceding the exact amount of each individual check, IFSB does not appear to dispute the total amount of the checks cashed, but maintains that the "amount and Plaintiff's characterization of each check ... is immaterial to resolution" of IFSB's motion for summary judgment. *Id.* ¶ 15.

In addition to the checks cashed by Holmes, the Individual Defendants also made purchases with personal and corporate credit cards and paid the credit card bills with checks written on the WTU's IFSB account. Def.'s Facts ¶¶ 41 - 44. Some of the Individual Defendants wrote and cashed checks on the WTU's IFSB account and kept the cash or deposited the cash in their personal bank accounts. *Id.* ¶¶ 45 - 50. Furthermore, some of the

Individual Defendants embezzled WTU funds by causing checks to be written on the WTU's IFSB account and paid to an entity maintained by Defendants Martin and Alderman, Expressions Unlimited, and keeping the funds for personal use. *Id.* ¶ 51. Between 1995 and 2002, the Individual Defendants embezzled and misappropriated in excess of five million dollars ($5,000,000) from the WTU. *Id.* ¶ 54.

The government brought criminal charges against most or all of the Individual Defendants. Leroy Holmes pled guilty to Conspiracy to Launder Proceeds of an Unlawful Activity. *See United States v. Leroy Holmes*, Criminal No. 03-00032 (D.D.C. Feb. 6, 2003)(RJL). Michael Martin pled guilty to Conspiracy to Launder Proceeds of an Unlawful Activity. *See United States v. Michael Wayne Martin*, Criminal No. 03-00138 (D.D.C. April 11, 2003)(RJL). Barbara Bullock pled guilty to Mail Fraud and Aiding and Abetting and Conspiracy to Commit Crimes Against the United States. *See United States v. Barbara A. Bullock*, Criminal No. 03-00435 (D.D.C. Oct. 7, 2003)(RJL). Errol Alderman pled guilty to Conspiracy. *See United States v. Errol Alderman*, Criminal No. 03-00429 (D.D.C. Oct. 15, 2003)(RJL). Cheryl Martin pled guilty to Conspiracy. *See United States v. Cheryl H. Martin*, Criminal No. 04-00054 (D.D.C. Feb. 19, 2004)(RJL). On August 31, 2005, following a jury trial, Defendants Gwendolyn Hemphill and James Baxter were convicted on twenty-three criminal counts, including

Conspiracy and Aiding and Abetting, Wire Fraud, Embezzlement from a Labor Organization, and Money Laundering.  Those convictions were affirmed on appeal.  *See United States v. Hemphill, et al.*, 514 F.3d 1350 (D.C. Cir. 2008).

On April 18, 2006, this Court entered default judgments against Defendants Barbara Bullock, Gwendolyn Hemphill, James Baxter, Errol Alderman, individually and doing business as Expressions Unlimited, Cheryl Martin, and Michael Martin, individually and doing business as Expressions Unlimited.  The Court ordered that the amount of the default judgment shall be determined pursuant to procedures set forth in Federal Rule of Civil Procedure 55.  On September 28, 2007, the Court granted plaintiffs summary judgment against Defendant Leroy Holmes.

## II.  DISCUSSION

### A.    Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most

favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.   Analysis**

Plaintiffs AFT and the WTU assert four claims against IFSB: (1) recredit of account for unauthorized payments and checks; (2) aiding and abetting the Individual Defendants' conversion and embezzlement; (3) aiding and abetting the Individual Defendants' breach of fiduciary duty; and (4) negligence.  Each claim against IFSB is based on plaintiffs' allegations that IFSB wrongfully cashed numerous checks written on the WTU account.  Plaintiffs seek damages from ISFB in excess of $1.45 million in checks made payable to certain Individual Defendants and seek to hold IFSB liable for the $5 million embezzled from the WTU on a theory of joint and several liability.

IFSB maintains that it is entitled to summary judgment on all of plaintiffs' claims on the grounds that the claims are time barred, that plaintiffs cannot establish the necessary elements of their aiding and abetting and negligence claims, and that plaintiffs' negligence negates IFSB's liability.  Finally, defendant argues that as a matter of law IFSB cannot be held jointly and severally liable.

The following discussion will briefly address each of defendant's arguments; however, because the Court finds that genuine issues of material fact pervade these claims and must be

decided by a fact finder at trial, this discussion is intended to be illustrative, not exhaustive.

### 1.   The Statute of Limitations

Defendant argues that all or some of plaintiffs' claims are barred by the District of Columbia's three-year statute of limitations for negligence and aiding and abetting claims. Defendant's Motion for Summary Judgment ("Def.'s Mot.") 8 (citing *Byrd v. Admiral Moving & Storage, Inc.*, 355 F. Supp. 2d 234, 236 (D.D.C. 2005) (citing D.C. Code § 12-301(8) and D.C. Code § 12-301(8)).  *See also Johnson v. Long Beach Mortgage Loan Trust*, 451 F. Supp. 2d 16, 47 (D.D.C. 2006).  Because this action was filed against IFSB in February 2003, defendant insists that, at the very least, all claims for damages sustained prior to February 2000 are time barred.

Defendant further contends that pursuant to District of Columbia banking law, plaintiffs were under a duty to discover and report the unauthorized payments within one year because IFSB provided WTU with monthly bank statements and copies of cancelled checks written on the WTU account.  Def.'s Mot. 9-10 (citing D.C. Code § 28:4-406(c),(d) and (f)(2001 & 2005 Supp.)).  IFSB argues that all of the unauthorized signatures, alterations and forgeries were evident from the statements and cancelled checks and, because WTU failed to notify IFSB that the activity on the

8

account was unauthorized, plaintiffs' claims are time barred.
Def.'s Mot. 11.

For purposes of the statute of limitations, a cause of
action accrues when a party knows or, through the exercise of
reasonable diligence should have known, of the injury suffered as
a result of the wrongdoing.  *See Johnson,* 451 F. Supp. 2d at 41.
This is known as the "discovery rule."  Plaintiffs contend that
any applicable statute of limitations in this case was tolled,
however, by the "adverse domination doctrine."  Plaintiffs assert
that Bullock, Baxter, Hemphill and other Individual Defendants
adversely dominated, directed and controlled the WTU throughout
their scheme to embezzle WTU funds, thereby preventing discovery
of the fraud.  Plaintiffs' Opposition to Defendant's Motion for
Summary Judgment ("Pls.' Opp'n") 8-9 (citing *Resolution Trust
Corp. v. Gardner*, 798 F. Supp. 790 (D.D.C. 1992); *BCCI Holdings
(Luxembourg), S.A. v. Clifford*, 964 F. Supp. 468 (D.D.C. 1997)).
In other words, plaintiffs argue, the very people who would
ordinarily be in the position to discover the scheme were, in
this case, the perpetrators, and those individuals had no
incentive to investigate or stop the wrongdoing.

Plaintiffs also argue that any statute of limitations was
tolled by the Individual Defendants' fraudulent concealment,
which, according to plaintiffs, should be imputed to IFSB because
the Bank "aided and abetted the Individual Defendants' actions by

9

cashing large volumes and staggering amounts of checks for
Holmes, including Altered, Structured and Red Flag checks."
Pls.' Opp'n 13.

Plaintiffs contend that the Individual Defendants' adverse
domination of the WTU did not end until the summer of 2002, at
which time the WTU's Executive Board and the AFT discovered the
embezzlement scheme, initiated a series of audits, and then
timely filed suit against IFSB in February 2003.  Defendant
counters that there was no adverse domination of the WTU, and
therefore the statutes of limitations were not tolled, because
the WTU's Board, its vice president, and the AFT had domination
and control over the WTU and could have discovered the
embezzlement scheme.

This Court finds that whether plaintiff WTU was adversely
dominated, whether the Individual Defendants engaged in
fraudulent concealment, and when the plaintiffs discovered or
should have discovered the embezzlement scheme and the
unauthorized activity with respect to the WTU account, is a
highly fact-intensive inquiry that must be made by the fact
finder.  *See, e.g., Johnson,* 451 F. Supp. 2d at 41 (quoting
*Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996) ("Where the
discovery rule applies, 'the inquiry is highly fact bound and
requires an evaluation of all of the plaintiff's
circumstances.")).

2.    **Aiding and Abetting Claims**

Under District of Columbia law, in order to bring a successful aiding and abetting claim, plaintiff must establish that: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. 1983) (citations omitted).

Defendant contends that plaintiffs cannot sustain their burden to establish that IFSB knowingly and substantially assisted the Individual Defendants in the embezzlement scheme or that IFSB was generally aware of its role in the scheme.  Def.'s Mot. 17.  Defendant points out that the Bank contacted the WTU on a number of occasions to verify transactions by Holmes, questioned Holmes regarding the purpose of the checks, and sought to confirm signatures on the checks. *Id* at 17-18.  Moreover, defendant points to Holmes's testimony in this case that he lied to IFSB personnel about the checks and that no Bank employee was in on the scheme or knew details of the scheme.  *Id.*

Plaintiffs respond that they can demonstrate "knowing assistance" - the second element of the aiding and abetting claims - by showing that IFSB knowingly undertook certain actions

11

which it knew would provide assistance to the Individual
Defendants.  Pls.' Opp'n 25 (citing *Foltz*, 627 F. Supp. 1143,
1163 (D.D.C. 1986)).  Plaintiffs also maintain that they can meet
this element by demonstrating IFSB's "willful blindness, or
conscious avoidance" with respect to the wrongful conduct.  *Id.*
(citing *Williams v. Obstfeld*, 314 F.3d 1270, 1278 (11th Cir.
2002) ("Under the doctrine of willful blindness or deliberate
ignorance, which is used more often in the criminal context than
in civil cases, knowledge can be imputed to a party who knows of
a high probability of illegal conduct and purposely contrives to
avoid learning of it.") (internal citations omitted)).

In support of their claims that the defendant assisted or
was willfully blind to the obviously-illegal conduct at issue,
plaintiffs note that the WTU was the IFSB's largest customer and
that the two institutions had a "long standing relationship."
Pls. Facts ¶ 45.  During oral argument on the defendant's motion
for summary judgment, counsel for IFSB acknowledged that the Bank
was "a troubled institution," and that regulators were concerned
about "the profitability of the Bank."  Transcript of Oral
Argument, Feb. 8, 2007, at 22.

Without deciding at this stage whether a theory of willful
blindness would sustain plaintiffs' claims against IFSB, the
Court finds that there are a number of genuine issues of material
fact in dispute that make summary judgment on the aiding and

abetting claims inappropriate.  For example, plaintiffs point to declarations by two bank tellers that they knew Holmes was the WTU chauffeur and that they found the large checks Holmes cashed on the WTU account to be suspicious.  One of the tellers shared her suspicions with her supervisor and was told that because the WTU "was a large customer and a long-time customer of IFSB," she could cash the check.  The same teller also raised the question of whether the transactions should be investigated, and her supervisor told her that the "signatures on the checks were fine and 'left it at that.'"  Pls.' Facts ¶¶ 61 - 65 (citing Smalls and Henderson Declarations).  Defendant IFSB does not dispute that these tellers made these declarations.  Def.'s Resp. To Pls.' Facts ¶¶ 61 - 65.

### 3.  Negligence

Under District of Columbia law, the elements of negligence are: (1) a duty of care owed to the plaintiff; (2) breach of that duty; (3) injury to the plaintiff; and (4) the injury was proximately caused by the breach of duty.  *See, e.g., Bullock v. Nat'l City Mort. Co.*, 735 A.2d 949 (D.C. 1999).  Without conceding that plaintiffs can meet the first three elements of their negligence claim, defendant focuses its argument for summary judgment on the final element, proximate causation.  Def.'s Mot. 19 - 23.

Defendant IFSB argues that plaintiffs fail to establish causation because (1) plaintiffs' injury would have occurred notwithstanding IFSB's conduct and (2) plaintiffs' injury was not foreseeable under the circumstances.  *Id*. at 20.  First, Defendant submits that even if IFSB personnel had contacted the WTU regarding the questionable transactions, there is no evidence that the activity would have ceased because the signatories on the account and the WTU officers and employees were the perpetrators of the embezzlement scheme.[2]  *Id.*  In fact, defendant argues that "[w]hen checks presented at the Bank were missing a co-signer's signature, IFSB informed the WTU, and perpetrators of the embezzlement simply affixed an additional signature."  *Id*. at 21.  According to the defendant, the embezzlement scheme would have occurred in the absence of any negligence by IFSB and, therefore, "IFSB's conduct was not a cause-in-fact of" plaintiffs' harm.  *Id.*

---

[2] The Court notes that defendant's argument that anyone at the WTU that the Bank did and/or would have contacted in order to confirm the validity of the transactions - for example, Hemphill, Bullock or Baxter - would not have acted to prevent the cashing of the altered checks because they were the perpetrators of the scheme, seems to provide support for plaintiffs' "adverse domination" theory, discussed *supra* pp. 8-9.  Indeed, the facts cited in support of the plaintiffs' "adverse domination" theory are some of the same facts defendant relies upon to suggest that even had they raised the questionable account activity with the WTU, the scheme would not have been detected or prevented.  In other words, these are genuine issues of material fact in dispute that must be resolved by the fact finder.

Defendant also argues that it was not "foreseeable in light of the surrounding circumstances" that IFSB's conduct would cause plaintiffs' harm.  *Id.* at 22 (citing *Wagshal v. District of Columbia*, 216 A.2d 172, 175 (D.C. 1996) and *Bailey v. District of Columbia*, 668 A.2d 817 (D.C. 1995)).  In addition, defendant contends that because of the intervening criminal acts, plaintiffs must make a "heightened showing of foreseeability" in order to establish IFSB's liability.  *Id*. at 22 (quoting *Bailey*, 668 A.2d at 819).  Defendant IFSB maintains that the criminal conduct in this case was unusual in that it involved employee theft by "every authorized signer on the customer's account" and was repeated over the course of many years.  Def.'s Mot. 22 - 23. Because of these unusual circumstances, defendant argues that IFSB could not have foreseen the injury to plaintiffs.

Finally, defendant argues that IFSB is entitled to summary judgment in its favor on plaintiffs' negligence claims because IFSB did not breach the applicable standard of care and comported with commercially reasonable banking standards.  Def.'s Mot. 24 - 31.

Plaintiffs counter that summary judgment for the defendant must be denied because plaintiffs can establish that their harm would not have occurred in the absence of IFSB's breach of the standard of care.  Pls.' Opp'n 29.  Plaintiffs cite to their expert's conclusion that IFSB did not follow commercially

15

reasonable banking practices with respect to the WTU account.
Moreover, plaintiffs dispute IFSB's contention that the harm to
plaintiffs - i.e., the embezzlement - would have occurred even
had IFSB contacted the WTU; plaintiffs point out that IFSB could
have contacted the WTU's Executive Board and that IFSB was aware
that the Executive Board had designated the account's signatories
by board resolution.  Pls.' Opp'n 31 (citing Pls.' Facts ¶¶ 27,
29).  Plaintiffs further contend that even if IFSB contacted
Hemphill regarding check-cashing activity and Holmes's authority
to cash checks on the WTU account, Hemphill was not a signatory
on the account and IFSB was not authorized to take direction from
Hemphill regarding the account.  Def.'s Resp. to Pls.' Facts ¶
28.

Plaintiffs also maintain that their injury was foreseeable
and that, even under a heightened standard of scrutiny resulting
from intervening criminal acts by a third party, IFSB should have
foreseen the harm to plaintiffs.  First, plaintiffs point to
their expert's opinion that the banking industry is always aware
that it is a target for fraud.  Second, plaintiffs note that IFSB
tellers were suspicious of the check amounts cashed by Holmes.
Finally, plaintiffs submit that the nature of Holmes's check-
cashing activity served to put the Bank on notice of improper
activity and that the Bank cashed a number of altered checks on
the WTU account despite the fact that the Bank itself had

16

identified altered checks as a common sign of fraud.  Pls.' Opp'n
32 - 33 (citing Pls.' Facts ¶¶ 32, 33, 48).

Plaintiffs further argue that defendant failed to comport
with commercially-reasonable banking standards with respect to
the WTU account.  In addition to their own expert's report,
plaintiffs point to Holmes's testimony that after the first year,
he was not asked for identification when cashing checks at the
Bank, testimony that tellers did not check signature cards on the
account when cashing checks, and evidence that checks with only
one signature were cashed, despite an account agreement that
required two signatures.  Pls.' Facts ¶¶ 41, 47, 80.

Plaintiffs also cite to testimony from Esther Hankerson,
General Vice-President of the WTU, who had check-signing
authority on the account, Def.'s Facts ¶ 25, that she was
contacted one time about a check with her signature that she had
not signed.  Pls.' Facts ¶ 75.  Plaintiffs maintain that Ms.
Hankerson told the Bank that she had not signed that check and
that they could cash that particular check, but not to cash any
other checks in which her signature appeared to be forged.  Pls.'
Facts ¶ 76.  Nevertheless, the Bank honored more than forty
checks containing Ms. Hankerson's forged signature without
contacting her to verify her signature or get her authorization.
Pls.' Facts ¶ 77.  While defendant IFSB does not dispute that Ms.
Hankerson was contacted about a forged check and that she was not

contacted again by the Bank, they dispute plaintiffs'
characterization of her testimony as to what she told the Bank
regarding future checks and whether the Bank knowingly cashed
forty forged checks.  Def.'s Resp. to Pls.' Facts ¶¶ 75 - 77.
This only serves to highlight, however, the disputed nature of
the evidence in this case.

### 4.   Contributory Negligence

Defendant IFSB insists that under District of Columbia law,
plaintiffs' negligence absolves the Bank of any liability for
plaintiffs' claims.  Def.'s Mot. 32 (citing D.C. Code § 28:3-
406(a)) ("A person whose failure to exercise ordinary care
substantially contributes to an alteration of an instrument or to
the making of a forged signature on an instrument is precluded
from asserting the alteration or the forgery against a person
who, in good faith, pays the instrument or takes it for value or
for collection.").  Defendant maintains it is shielded from
liability because District of Columbia law provides that an
employer bears the loss for fraudulent endorsements made by an
employee on a check where the employer has given "responsibility"
for checks to the employee.  Def.'s Mot. 33 (citing D.C. Code §
28:3-405 & cmts.).  However, in a footnote, defendant
acknowledges an exception to D.C. Code § 28:3-405 where a bank
that honors a check fails to exercise ordinary care and that
failure contributes to the loss resulting from the fraud; in such

a case, the person suffering the loss may recover from the bank to the extent that the bank's failure to exercise ordinary care contributed to the loss.  Def.'s Mot. 33, n.16 (citing D.C. Code § 28:3-405(b)).  Although defendant IFSB argues that this exception does not apply in this case "because the undisputed facts show that IFSB exercised ordinary care in handling the transactions on the WTU account," in fact the question of whether the Bank exercised ordinary care is very much in dispute and plaintiffs have offered an expert opinion that the Bank failed to exercise ordinary care.  Def.'s Mot. 33, n.16; Pls.' Resp. 34-38 (citing Butler Report).

Defendant argues that plaintiffs WTU and AFT were negligent and that the WTU must bear the loss for the embezzlement. Defendant contends that the WTU failed to oversee its officers and employees, failed to get independent audits, and took other steps or failed to take steps that increased the risk of the embezzlement.  Def.'s Mot. 33 - 37.  Similarly, defendant maintains that AFT was negligent in its oversight of the WTU and that this negligence also substantially contributed to the embezzlement.  Def.'s Mot. 37 - 38.  Plaintiffs respond that they deny and dispute the facts cited by defendant regarding the WTU and AFT's alleged failures, that because the WTU was adversely dominated, plaintiffs cannot have been contributorily negligent, and insist that findings of contributory negligence are for the

fact finder and not appropriate at the summary judgment stage.
Pls.' Resp. 42 - 45.

Without addressing each of the facts offered by defendant
IFSB to establish contributory negligence or the counter
arguments made by plaintiffs to negate such a finding, the Court
holds that there are disputed material facts at issue in this
case that prevent a determination at the summary judgment stage
that plaintiffs were contributorily negligent and, therefore,
that they cannot recover against defendant IFSB.

### 5.    Recredit of Account

Plaintiffs seek a recredit of funds to the WTU account based
on defendant IFSB's failure to exercise ordinary care, pursuant
to D.C. Code § 28:4-103.  In a cursory manner, defendant argues
that plaintiffs are not entitled to a recredit of their account
because plaintiffs cannot establish that they fulfilled their
duty to discover and report unauthorized signatures or
alterations.  Def.'s Mot. 40 (citing D.C. Code § 28:4-406).
Plaintiffs respond that once the adverse domination of the WTU by
the Individual Defendants ended, the WTU promptly acted to
discover and report to the Bank the account irregularities.
Pls.' Resp. 46.

Again, whether the WTU was adversely dominated, whether the
plaintiffs could have earlier discovered the embezzlement scheme,
and whether the Bank failed to exercise ordinary care are all

issues for the fact finder and cannot be resolved by this Court
on summary judgment.

### 6.   Joint and Several Liability

Plaintiffs seek to hold IFSB jointly and severally liable
with the Individual Defendants for the entire $5,000,000 in
damages plaintiffs incurred as a result of the embezzlement
scheme.  Defendant IFSB insists that at most the Bank is liable
only for the $1.4 to $1.7 million plaintiffs lost as a direct
result of the checks cashed by Holmes and the other Individual
Defendants on the WTU account, and not the entire $5 million,
which includes amounts paid to credit card accounts and for other
purchases by the Individual Defendants.  Def.'s Reply 24-25.

Defendant relies on *United States v. Philip Morris USA*, 316
F. Supp. 2d 19 (D.D.C. 2004), a RICO suit against cigarette
manufacturers, in support of its position that as a matter of law
the Bank cannot be held jointly and severally liable because the
plaintiffs cannot show that the Bank acted in concert or shared a
common purpose with the Individual Defendants.  Def.'s Mot. 41-43
(citing *Philip Morris*, 316 F. Supp. 2d at 26 ("joint and several
liability is rooted in the principle that a wrongdoer is liable
for the reasonably foreseeable acts of his fellow wrongdoers
committed in furtherance of their joint undertaking") (internal
citations omitted)).  Defendant further maintains that plaintiffs
cannot establish a "single injury," and therefore IFSB is not

jointly liable, where the $1.45 million injury that plaintiffs allege IFSB played a role in causing is a "subset" of, or divisible from, the $5 million total injury plaintiffs allege against the Individual Defendants.  Def.'s Mot. 42-44 (citing *Faison v. Nationwide Mort. Corp.*, 839 F.2d 680, 687 (D.C. Cir. 1988) (defining "single injury" as "a single indivisible result) and 74 Am. Jur. 2d § 59 ("Separate and distinct tortious acts resulting in separate and distinct injuries, even to the same subject matter, do not create joint liability on the part of the tortfeasors.")).

In response, plaintiffs contend that in cashing the Individual Defendants' forged and/or improper checks on the WTU account, IFSB's "inaction or misconduct was a substantial cause of the ultimate injury" and that IFSB assisted the Individual Defendants' unlawful scheme.  Pls.' Resp. 47.  Plaintiffs further argue that defendant has misconstrued the law on joint and several liability, asserting that in the District of Columbia, the "general rule is that joint tortfeasors are jointly and severally liable for compensatory damages").  *Id.* at 48 (citing *Hill v. McDonald*, 442 A.2d 133, 137 (D.C. 1982).

Two cases relied upon by plaintiffs persuade the Court that it would be premature, given the numerous and material disputed facts in this case, to grant summary judgment for defendant IFSB on the question of joint and several liability.  First, in *Hill*,

22

a child allegedly slipped on a puddle of water and slid under an
allegedly defectively-designed protective handrail, falling five
stories and incurring severe injuries.  *Hill*, 442 A.2d at 135.
Plaintiff brought suit against the landlord and the landlord
filed a third-party complaint against the architects, who had
been engaged by the landlord to redesign the building.  *Id.*  Hill
settled with the landlord and signed a release, "purporting to
discharge only the landlord."  *Id.* at 136.  Hill then filed a
separate suit against the architect, who moved for summary
judgment on the grounds that the release as to the landlord
barred Hill's suit against the architect engaged by the landlord.
*Id.*  The Superior Court of the District of Columbia granted
summary judgment for the architect.

The District of Columbia Court of Appeals held that the
trial court erred in concluding that the proximate cause of
Hill's injury was the defective handrail and not the puddle or a
combination of the puddle and the handrail.  *Id.* at 137.  The
appellate court went on to find that Hill's initial complaint had
alleged that the landlord was a joint tortfeasor with the
architect and therefore Hill was not limited to vicarious
liability against the architect.  *Id.* at 137-138 ("Two persons
whose concurrent negligence causes injury to a third are liable
jointly and severally, and their liability will not be affected
by the relative degree of negligence, or by the care required of

each.") (internal citations omitted).  In a footnote, the court

of appeals stated

> The District of Columbia long ago abandoned the common-law
> requirement that the defendants have engaged in concerted
> action to be liable as joint tortfeasors.  See *McKenna v.*
> *Austin*, 77 U.S. App. D.C. 228, 231, 134 F.2d 659, 662 (1943)
> ("It is a first principle that liability in tort is several,
> not joint, however many participate in inflicting the wrong
> and whether they act separately or in conjunction.")  It is
> sufficient if there are 'substantially concurrent' negligent
> acts each contributing to a single injury.

*Hill*, 442 A.2d at 138, n.3 (additional citations omitted).

Based on *Hill*, this Court is not convinced by defendant

IFSB's argument that joint and several liability is unavailable

as a matter of law simply because the plaintiffs cannot show that

the Bank acted in concert or shared a common purpose with the

Individual Defendants.

Further, the Court rejects defendant IFSB's contention that

joint and several liability cannot be had in this case because

plaintiffs injury is divisible.  As previously discussed,

plaintiffs have alleged aiding and abetting claims that cannot be

dismissed at the summary judgment stage.  *See supra* pp. 9-12.  In

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the U.S.

Court of Appeals for the District of Columbia Circuit explored

the differences between aiding and abetting on the one hand, and

civil conspiracy on the other.  The court noted, "[a]iding-

abetting focuses on whether a defendant knowingly gave

'substantial assistance' to someone who performed wrongful

24

conduct, not on whether the defendant agreed to join the wrongful

conduct." *Id.* at 478.  The court concluded its discussion of the

differences between conspiracy and aiding and abetting as

follows:

> The theory of liability also affects who is liable for what.
> An aider-abettor is liable for damages caused by the main
> perpetrator, but that perpetrator, absent a finding of
> conspiracy, is not liable for the damages caused by the
> aider-abettor.

*Id.*

Whether IFSB aided and abetted the Individual Defendants is

a question of fact for the fact finder to determine.  Until that

time, the Court will not foreclose the possibility of joint and

several liability as a matter of law.

**III. CONCLUSION**

For the foregoing reasons, IFSB's motion for Summary

Judgment is **DENIED.**


**Signed:    Emmet G. Sullivan**
**            United States District Judge**
**            March 17, 2008**

25